COUNCIL OF AMERICAN–FLAG SHIP OPERATORS, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

Civ. A. No. 83–3578.

United States District Court, District of Columbia.

Sept. 26, 1984.

Robert T. Basseches, Shea & Gardner, Washington, D.C., for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Joseph E. DiGenova, U.S. Atty., Civ. Div. Robert G. Damus, Linda L. Cromwell, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

This case presents the question of whether the Cargo Preference Act of 1954 (CPA), 46 U.S.C. § 1241(b), applies to cash assistance furnished to Israel by the Agency for International Development (AID). The Act provides that:

Whenever the United States ... shall furnish to or for the account of any foreign nation without provision for reimbursement, any equipment, materials, or commodities, ... or shall advance funds or credits or guarantee the con-

vertibility of foreign currencies in connection with the furnishing of such equipment, materials, or commodities, the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage ... which may be transported on ocean vessels shall be transported on United States-flag commercial vessels ....

Cash transfers to Israel are authorized by amendments to the Foreign Assistance Act. The amendments effective for the fiscal year 1979 and thereafter provide that:

The total amount of funds allocated for Israel ... may be made available as a cash transfer. In exercising the authority of this paragraph [of the amendment], the President shall ensure that the level of cash transfers made to Israel does not cause an adverse impact on the total amount of nonmilitary exports from the United States to Israel.

22 U.S.C. § 2346a(b)(2).[1]

Primary responsibility for the administration of the Cargo Preference Act has been exercised by the Maritime Administration (MarAd), now an element of the Department of Transportation. The Foreign Assistance Act, including cash transfers to Israel, has been administered by AID. At one time, financial assistance to Israel was provided under the Commodity Import Program (CIP). Under that program the beneficiary nation, in this case Israel, was reimbursed by AID for the foreign exchange expended by the beneficiary for specific nonmilitary imports. Both AID and the Maritime Administration agreed that the Cargo Preference Act applied to these transactions. From 1976 through 1978 part of the assistance to Israel was furnished pursuant to CIP, but an additional amount was provided as a nonreimbursable cash grant in order to finance such things as Israel's withdrawal from the Sinai and the additional cost of oil incurred as a result of the withdrawal. Beginning in 1979 and thereafter, no assistance has gone

---

**1.** Two thirds of the funds disbursed under the cash transfer program take the form of cash grants. The remaining third is in the form of loans. 59 Comp.Gen. 279, 280 (1980).

162

to Israel pursuant to CIP; all has been by cash transfer.

After 1976, the Maritime Administration took the position that the Cargo Preference Act applied to cash grants and cash transfers. MarAd relied upon 1954 and 1955 congressional reports which expressed the view that the Cargo Preference Act would apply to programs financed in any way by federal funds in whatever form they might take. *See* General Counsel of the Maritime Administration, Department of Commerce, Memorandum dated March 28, 1979, at 4. AID, however, adhered to its long standing position that

> the requirements of the Cargo Preference Act are inapplicable to cash grants or transfers carried out pursuant to authority contained in the Foreign Assistance Act of 1961, as amended ....

Letter dated August 8, 1978 from Barry Veret, Assistance General Counsel, AID, to L. Mitchell Dick, Assistant General Counsel, United States General Accounting Office (GAO). To resolve the conflicting opinions, MarAd sought the advice of the Comptroller General (GAO) as to whether the MarAd interpretation was "acceptable."

In an opinion dated March 3, 1980, the GAO disagreed with the Maritime Administration's view that the CPA applies to the cash transfer program for Israel. In GAO's view the cash transfer program was materially different from the Commodity Import Program to which the CPA applied. Under CIP, individual transactions were documented so that "money was tied to commodity purchases." 59 Comp.Gen. 279, 279 (1980). Under the cash transfer program, "the need to document each purchase of goods made by Israel to obtain reimbursement was obviated." *Id.* at 280. Instead, the United States required only an assurance from Israel that its nonmilitary imports from the United States would at least equal American assistance and that American exporters' competitive positions

would not be adversely affected. Without disparaging the administrative difficulties which would confront an effort to apply the CPA to cash transfers, the GAO based its opinion entirely on legal considerations. GAO agreed with AID that the Cargo Preference Act related to the furnishing of "equipment, materials or commodities" and that the cash transfers to Israel are not advanced in connection with the furnishing of such items. It distinguished the direct linkage of AID funds to commodities purchased under CIP from the "unrestricted" aid furnished by cash transfers. The GAO was not persuaded that the requirement that Israel maintain purchasing levels in the United States requires or justifies application of the CPA, because "shipments of nonmilitary exports ... cannot be identified as purchases made by Israel with American Funds." *Id.* at 283.

Although the Comptroller General's 1980 opinion was not binding on the Maritime Administration (and is not binding on this Court),[2] MarAd officials have advised counsel for the United States that since 1980,

> MarAd has not pursued enforcement of the requirements of the Cargo Preference Act with respect to cash assistance to Israel.

Defendant's Post-Hearing Memorandum at 1–2.

Since 1980, the issue before the GAO has apparently been addressed by congressional committees. A subcommittee of the House Committee on Foreign Affairs referred to an "understanding" between the United States and Israel that, among other things,

> Israel will also continue to follow procedures designed to assure that U.S. carriers revive [sic] a fair share of its market.

*Foreign Assistance Legislation for Fiscal Year 1982 (Part 3): Hearings and Markup Before the Subcomm. on Europe and the Middle East of the House Comm. on Foreign Affairs,* 97th Cong., 1st Sess. XIII 1981. A Senate Foreign Relations Commit-

---

**2.** *See Delta Data Systems Corporation v. Webster, et al.,* 744 F.2d 197 at 201–202 (D.C.Cir. 1984).

tee Hearing was advised that the Government of Israel:

> assures us that, regarding the transport of goods imported from the United States, it will continue to follow established procedures for bulk shipments of grain on dry bulk carriers. These procedures have been developed to insure that U.S.-flag carriers receive a fair share of the market.

*Security and Development Assistance: Hearings Before the Senate Comm. on Foreign Relations,* 98th Cong., 1st Sess. 393 (1983).

In 1983, the House Committee on Foreign Relations issued a "Report on Clarifying the Government Cargo Preference Laws." The report noted "a lack of clarity" in the Cargo Preference Act of 1954 as to whether it applies to the cash transfer program for Israel. After the Committee Chairman made his position known to the Departments of State and Transportation "and after some negotiations," the Department of State decided not to change the application of cargo preference to Israel. The report indicated that the Committee had since been advised that for fiscal year 1982 and for the first quarter of 1983 Israel had complied with the 50 percent cargo preference requirement. Finally, the Report noted that the Committee's staff had drafted a comprehensive revision of the cargo preference laws, but that the Committee took no position on the draft. H.R. Rep. No. 5, 98th Cong., 1st Sess. 20–21 (1983).[3] Meanwhile, in each year since the 1979 fiscal year, Congress has re-enacted the Foreign Assistance Act amendments providing for cash transfers to Israel with the general proviso for the maintenance of the pre-existing level of U.S. exports.

**3.** On another occasion, the House Subcommittee on Europe and the Middle East was advised that Israel and the United States have an understanding that Israel "would follow agreed procedures to achieve at least 50 percent of the grain shipped on U.S. bottoms," and that in 1982 Israel reached "just in excess of 50 percent." *Foreign Assistance Legislation for Fiscal Years 1984–85 (Part 3): Hearings and Markup Before the Subcomm. on Europe and the Middle East of*

**II.**

Plaintiffs are a trade association of U.S. ship operators and two other nonprofit entities organized to promote the development of the U.S. Merchant Marine and the U.S. Flag Fleet. Each has members who provide shipping service between Israel and the United States. They allege that AID's failure or refusal to apply the CPA to cash transfers to Israel will cause their members a substantial loss of cargo shipments. Plaintiffs' standing is not challenged, nor is this Court's jurisdiction. Nevertheless, the accompanying order will grant defendant's motion for summary judgment and dismiss the complaint.

On the merits, plaintiffs have failed to persuade that the CPA applies to cash transfers that are unaccompanied by any requirement for documentation and reimbursement for each item purchased. By its literal terms, the Act, in relevant part, applies only to transactions in which the United States furnishes "without provision for reimbursement, any equipment, materials, or commodities," or advances "funds or credits or guarantee[s] the convertibility of foreign currencies *in connection* with the furnishing of such equipment, materials, or commodities ...." 46 U.S.C. § 1241(b)(1) (emphasis added). There is no reference to unrestricted cash transfer. Cash deposited to a bank account without specific earmarking as to where or for what the recipient will expend it is materially different from the transactions contemplated by the statute.

Plaintiffs rely on Committee Reports and statements by Senators and Congressmen expounding a broad construction of the CPA.[4] But it would wrench the statutory language too far beyond its plain meaning

*the House Comm. on Foreign Affairs,* 98th Cong., 1st Sess. 10 (1983). The Subcommittee was also advised that the additional cost to Israel of using U.S. bottoms to ship grain (instead of shipping at foreign flag rates) was $31,590,362. *Id.*

**4.** Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 4–7; *see, e.g., Cargo Preference Bill: Hearings on S. 3233 Before a Sub-*

to construe the statute to apply to the cash transfers to Israel at issue here.

Moreover, the Cargo Preference Act is only one of the congressional enactments to be considered. More germane legislation is embodied in the several statutes which have authorized and renewed authorization for cash transfers to Israel. It is plain that the Congresses which enacted those authorizations had notice of the tension between the views of Maritime Administration and those of AID. If those Congresses had decided to make the CPA apply to cash transfers, exposition of that preference would have been a simple matter. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–5, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381–82, 89 S.Ct. 1794, 1801–03, 23 L.Ed.2d 371 (1969); *United States v. Bergh*, 352 U.S. 40, 46–47, 77 S.Ct. 106, 109–110, 1 L.Ed.2d 102 (1956). Indeed, defendant has cited at least one such proposed bill, which conspicuously failed of enactment.[5] Instead, for protection of American exporters, Congress has been satisfied with the precatory language in the Foreign Assistance Act amendments.[6] This language has generated understandings between the United States and Israel that about 50% of the grain imported into Israel from the United States will be carried by U.S. flag vessels. And Congress has apparently acquiesced in this practice, as evidenced by repeated reenactment of the statute. AID has thus complied with the only law applicable to cash transfers to Israel.

Plaintiffs argue that this construction of the Foreign Assistance Act amendments and the Cargo Preference Act is contrary to the interpretation once advocated by the Maritime Administration, the agency with primary responsibility for administering the CPA. They argue that if MarAd's interpretation is a plausible one, it should be accepted by a reviewing court. *See Sea-Land Services, Inc. v. Dole*, 723 F.2d 975, 979 (D.C.Cir.1983). They point to section 901(b)(2) of the Merchant Marine Act of 1936 which originally required every department or agency having responsibility for the Cargo Preference Act to administer it under regulations issued by the Secretary of Commerce.[7] They argue that a MarAd regulation issued pursuant to this 1936 Act is binding on AID and requires it to apply the CPA to the cash transfer program. *See* 46 C.F.R. § 381.7. The regulation requires the affected agency to include clauses in contracts which provide that 50% of the freight revenue and tonnage of cargo generated by the grant, loan or advance be transported on privately owned U.S. flag commercial vessels. Again, however, the regulation is an interpretation of the CPA.

Plaintiffs' argument has two principal defects. First, MarAd's primary responsibility for the Cargo Preference Act does not extend to the Foreign Assistance Act amendments authorizing cash transfers to Israel. The latter Act is administered by AID. AID has consistently interpreted its act as exempting cash transfers to Israel and to other countries, particularly where that Act has its own built-in safeguard for American shipping and export interests. AID's contemporaneous construction of the recent FAA amendments,

---

comm. of the Senate Comm. on Interstate and Foreign Commerce, 83d Cong., 2d Sess. 1 (1954) (statement of Sen. Butler); S.Rep. No. 1584, 83d Cong. 2d Sess. 5 (1954).

5. *See* H.R. 6899, 96th Cong., 2d Sess. § 901 (1980); H.R.Rep. No. 935 (Part 1), 96th Cong., 2d Sess. 132 (1980). Section 901 of the bill would have applied the CPA's preference requirements whenever the United States advanced "funds or credits ... in connection with the furnishing of such equipment, materials, or commodities, or provide[d] any form of grant, advance, credit, cash transfer, or guarantee whatsoever to any party ...."

6. [T]he President shall ensure that the level of cash transfers made to Israel does not cause an adverse impact on the total amount of nonmilitary exports from the United States to Israel.
22 U.S.C. § 2346a(b)(2).

7. The 1936 Act also requires the Secretary to review the other agencies' administration of the Act and "annually report to the Congress with respect thereto." The authority embodied in section 901(b)(2) has since been delegated to the Secretary of Transportation. *See* 46 U.S.C. § 1241(b)(2).

confirmed by GAO, and surviving congressional re-enactment, is entitled to great deference by a reviewing court. *See Delta Data Systems Corporation v. Webster, supra,* at 201. Second, the Maritime Administration did once interpret the CPA as applying to cash transfers to Israel and challenged AID's contrary interpretation by requesting General Accounting Office, an agency of Congress, to confirm the MarAd view. The GAO, however, refused to support MarAd's legal position. The Maritime Administration has apparently abandoned its effort to enforce the CPA with respect to cash assistance to Israel. The contemporaneous AID–GAO interpretation of both statutes, advocated here by the Department of Justice, and undisturbed by Congress [8] when, after the 1980 GAO opinion, it renewed AID's authority to make cash transfers to Israel, appears to be the interpretation intended by Congress. As such, it will be honored in this case. *See NLRB v. Bell, supra,* 416 U.S. at 274–5, 94 S.Ct. at 1761–62. Accordingly, an accompanying order will grant defendant's motion for summary judgment and dismiss the complaint.

---

**8.** And no longer contested by MarAd.