**AMERICAN MARITIME TRANSPORT, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 41–88C.

United States Claims Court.

Sept. 29, 1989.

**284**

George J. Mannina, Jr. and John P. Meade, Washington, D.C., for plaintiff.

Genevieve Holm, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Jean K. Orenstein, Dept. of Transp., of counsel.

## OPINION

MARGOLIS, Judge.

This maritime subsidy case is before the court on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. The plaintiff, American Maritime Transport, Inc. (AMT) brought this action to recover payment of Operating Differential Subsidy (ODS) by the United States Maritime Administration (MARAD) and Maritime Subsidy Board (MSB or Board) under an Operating Differential Subsidy Agreement (ODSA). After careful consideration of the entire record and after hearing oral argument, the court concludes that jurisdiction exists over the dispute, and that the plaintiff is entitled to payment of the ODS. Accordingly, the plaintiff's motion for summary judgment is granted, and the defendant's cross-motion for summary judgment is denied.

## FACTS

On June 30, 1971, Aries Marine Shipping Company (Aries) and MARAD entered into ODSA No. MA/MSB–129. Under this agreement, Aries was to receive ODS for the operations of the vessels ULTRAMAR and ULTRASEA in accordance with the Merchant Marine Act of 1936, as amended, 46 U.S.C.App. §§ 1101 *et seq.* The agreement was to run for a period of twenty years and provided for subsidy payments to help offset the costs of operating the two vessels.

On the same day, Aries entered into a time charter agreement with Golden Eagle Liberia Limited (Golden Eagle) in which Golden Eagle agreed to charter the vessel

ULTRASEA from Aries for twenty years commencing upon the date the vessel was delivered to Aries by the construction shipyard. Under the time charter, Golden Eagle would pay Aries for use of the vessel. The time charter, which was approved by MARAD in 1971, contained only one limitation on cargo carriage by Golden Eagle. Article 27 of the charter provided that Golden Eagle should not "carry cargo subject to the cargo preference statutes of the United States ... unless the operating differential subsidy contract is amended to permit such carriage."

MARAD issued findings for compliance with section 601 of the Merchant Marine Act which requires that subsidized vessels be engaged in foreign competition, and for compliance with section 605(c) which requires that vessels operate as part of the U.S.-flag service. The findings under section 605(c) regarding U.S.-flag service described the operation of the vessels as "the carriage of liquid and dry bulk commercial cargoes, not subject to the cargo preference statutes including 10 U.S.C. 2631, 46 U.S.C. 1241, and 15 U.S.C. 616a...." A similar description referring to the cargo preference statutes was not included with the findings regarding foreign competition. However, a directive to MARAD's General Counsel to prepare the contract included this statement:

> [T]hat said vessels shall carry exclusively commercial liquid and dry bulk cargoes not subject to the cargo preference statutes of the United States ... and further provided that at such time as all required statutory findings shall have been made the United States will give full consideration to amending the operating-differential subsidy contract so as to permit the vessels operating thereinunder to carry liquid and dry bulk cargoes that are subject to the cargo preference statutes.

Apparently, at that time, MARAD considered cargo to which the cargo preference statutes applied as being outside the service description of "commercial" cargo.

Paragraphs I–1 and I–3 of the ODSA obligate the United States to pay ODS and the vessel operator to build, maintain and operate two vessels in the essential service "hereinafter designated." Article I–2(a) originally described that service as "world-wide carriage of liquid and dry bulk cargo in the foreign oceanborne commerce of the United States ..." but provided that the vessels "shall carry exclusively commercial liquid and dry bulk cargoes not subject to the cargo preference statutes of the United States...." In 1976, the original I–2(a) was deleted and replaced with language describing the service as "world-wide carriage of liquid and dry bulk cargo ... provided that said vessels shall not carry liquid and dry bulk cargoes subject to the cargo preference statutes of the United States...." *The word "commercial" was dropped.* A proviso was also added to allow carriage of preference cargoes if they would otherwise be carried by foreign-flag vessels at rates comparable to foreign-flag rates.

The 1976 Amendment to Article I–2(a) was made on the application of Aries Marine and its sister companies. The MARAD minutes wherein the requested amendment was considered indicate that the only cargo excluded from the service description in Article I–2(a) was cargo covered by the preference statutes of the United States. Those minutes said:

> Section 901(b)(1) of the Merchant Marine Act, 1936, as amended (Act), provides that at least 50 percent of the gross tonnage of equipment, materials, and commodities procured or contracted for by the United States for its own account or furnished to or for the account of any foreign nation, without provision of reimbursement, or in regard to which the United States advances funds or credits or guarantees foreign currency convertability, shall be transported on privately owned U.S.-flag commercial vessels at fair and reasonable rates for such vessels.
>
> The basic intent of the law is to give preference to U.S.-flag vessels in the carriage of such government impelled cargoes at fair and reasonable rates. As administered by the Department of Agriculture, about 50 percent of Agriculture sponsored (PL 480) cargoes have been

allocated to U.S.-flag vessels at fair and reasonable rates, which has been interpreted to mean, sufficient cargo income to cover the vessel voyage costs and to give the operator a fair return on its investment, usually necessitating rates in excess of the going world rate (premium rates).

To date, subsidized U.S.-flag bulk operators have been precluded from participating in this trade by a provision in their operating-differential subsidy (ODS) contracts which requires that the vessels covered by the contracts shall carry only commercial cargoes *"not subject to the cargo preference statutes* of the United States, including, but not limited to, 10 U.S.C. 2631, 46 U.S.C. 1241(b) and 15 U.S.C. 616a".

Minutes of the July 8, 1976 Regular Meeting of the Maritime Subsidy Board, at 8824–25. (Emphasis added).

Article I–3(b) of the contract contains contract provisions for enforcing compliance with the service description. I–3(b) requires MARAD approval for the ULTRASEA to carry cargoes not within the service described in Article I–2(a). MARAD can withhold approval if a service is outside the service description. If cargoes are within the service description, Article I–1 obligates MARAD to pay subsidy for that service.

On December 31, 1981, Golden Eagle assigned all its rights and interest to Ultramar Shipping Company, Inc. (Ultramar) and on February 10, 1986, Aries assigned all its rights and interest in the ODSA to AMT thereby leaving the plaintiff AMT as the vessel operator, with Ultramar as the time charterer. Under the terms of the time charter with Ultramar, Ultramar is responsible to AMT for the total actual vessel operating costs, plus the bareboat charter hire, regardless of whether AMT receives any ODS payments. The ODS payments that AMT was to receive were to be passed through to Ultramar.

On July 30, 1987, Ultramar and the Government of Israel entered into a consecutive voyage charter agreement (subcharter agreement) chartering the ULTRASEA

to the Government of Israel for the transportation of agricultural commodities from the United States to Israel. Paragraph 10(b) of that subcharter agreement states, in relevant part:

This Charter is also subject to U.S. Maritime Administration approval of the Chartered Vessel receiving Operating Differential Subsidy during the initial 3 year Term and, if extended, the additional 2 years of the Charter in accordance with an Operating Differential Subsidy Contract between the U.S. Maritime Administration and the Vessel's Owners....

Prior to fiscal year 1979, Israel received financial assistance from the United States under the Commodity Import Program (CIP). Under the CIP, Israel was reimbursed for the foreign exchange expended by Israel for specific nonmilitary imports. Both the Agency for International Development (AID), the agency that administered the CIP, and MARAD agreed that the Cargo Preference Act of 1954 (CPA) applied to these transactions. The CPA requires that at least fifty percent of the gross tonnage of cargo shipped be transported on United States-flag commercial vessels. 46 U.S.C. App. § 1241. As of fiscal year 1979, however, Israel began to receive assistance in the form of nonreimbursable cash grants (cash transfer program) instead of the scheme utilized under the CIP. These cash transfers are not subject to the CPA.

In contemplation of the shift of Israel's financial assistance from the CIP to the cash transfer program, the Economic Minister of Israel sent AID a letter dated August 29, 1978 (Side Letter). With regard to the importation of commodities to Israel, the Minister said "the Government of Israel *has decided* to continue importing from the United States, corn, wheat, soybeans ..." and "[r]egarding the carriage of goods imported from the United States, my government will continue to follow present procedures for bulk shipments of grain on dry bulk carriers. As you know, these procedures were worked out with A.I.D. and the Maritime Administration with a view toward *assuring a fair share of the*

*market for American carriers."* (Emphasis added.)

In order to effectuate the subcharter agreement between Israel and Ultramar, AMT requested MARAD's concurrence that ODS would be payable during the term of the subcharter agreement and on September 8, 1987, MARAD sent AMT a letter that stated:

> Reference is made to your letter of August 13, 1987, concerning the Consecutive Voyage Charter Party made July 30, 1987, between Ultramar Shipping Company, Inc. and the Government of Israel concerning the subsidized vessel ULTRASEA owned by American Maritime Transport, Inc. (AMT). You advised that the ULTRASEA will be engaged in the transport of commodities purchased by Israel pursuant to the cash transfer program, which is not subject to the Cargo Preference Act of 1954. Paragraph 10(b) of the charter states that the charter is subject to the Maritime Administration (MARAD) approval of the vessel receiving operating-differential subsidy (ODS) during the initial three year term and, if extended, the additional two years of the charter in accordance with AMT's Operating–Differential Subsidy Agreement (ODSA) MA/MSB–129.
>
> No approvals are necessary in order to permit the subject charter insofar as the ODSA is concerned (other MARAD approvals may be necessary). ODS will continue to be payable during the charter term in accordance with the provisions of AMT's ODSA. Since this charter obviously anticipates the carriage of U.S. government financed goods, we must remind all concerned parties that ODS is not payable for periods during which the vessel transports dry bulk cargo subject to the cargo preference statutes of the United States, including but not limited to 10 U.S.C. Section 2631 and 46 U.S.C. Section 1241, at fair and reasonable rates for U.S.-flag commercial vessels.

By letter dated September 10, 1987, MARAD advised AMT that approval was granted under section 9 of the Shipping Act of 1916, 46 U.S.C.App. § 808, which requires the Secretary of Transportation to approve the charter of a U.S.-flag vessel to any person not a United States citizen. By letter dated September 11, 1987, MARAD advised AMT that approval was granted under Title XI of the Merchant Marine Act, 46 U.S.C.App. §§ 1271, *et seq.*, which requires, as a condition of a federal loan guarantee, that MARAD approve any change in the operation and use of the vessel.

The September 8, 10, and 11, 1987 letters were signed by MARAD officials with authority to advise the public of official MARAD actions. In response to MARAD's letter of September 8, 1987, a telex was sent on September 14, 1987 to the Government of Israel and Ultramar confirming that the subcharter agreement was in full force and effect. Based on the series of approvals and the September 8 letter, the subcharter agreement between Ultramar and Israel came into force on September 14, 1987.

On October 20, 1987, MARAD advised AMT that MARAD's letter of September 8, 1987 "was not approval by the Maritime Subsidy Board (Board) and should not be taken as indicating the Board's approval of the payment of subsidy for Israeli side agreement cargoes." The letter expressed the Board's "serious concerns whether the carriage of the cargo under the charter is subsidizable." On November 6, 1987, AMT advised MARAD of AMT's position that the September 8, 1987 letter constituted a final agency decision that ODS was payable and that the parties to the subcharter agreement acted in reliance on MARAD's letters of September 8, 10 and 11, 1987.

On November 17, 1987, MARAD offered to settle the matter by paying subsidy to AMT until MARAD completed a rulemaking on the issue. AMT asked for a clarification of the settlement conditions and on December 3, 1987, MARAD advised AMT that the offer to pay ODS pending a rulemaking was conditioned on AMT's agreeing to forego any claim of reliance upon MARAD's September 8 letter. On December 22, 1987, AMT reiterated that it was entitled to the ODS payment, that it would

not waive its legal rights and that it relied on MARAD's September 8, 1987 letter.

The following day, MARAD wrote AMT acknowledging that although the cargoes were not subject to the cargo preference statutes, they were still not subsidizable because Israel agreed in the Side Letter to reserve for U.S.-flag vessels 50% of its cargoes. Moreover, MARAD asserted that cargo "reserved" for U.S.-flag vessels could not receive ODS payments under sections 601 and 605 of the Merchant Marine Act, which outline conditions for receipt of the subsidy.

On January 5, 1988, AMT requested payment of ODS for the first voyage of the ULTRASEA pursuant to the charter agreement. AMT was advised that ODS was approved and paid. On January 7, 1988, AMT wrote MARAD requesting a clarification regarding whether the payment of ODS signaled a change in MARAD's position. On January 15, 1988, MARAD requested that AMT return the ODS that was approved for payment on January 7, 1988. AMT returned the funds under protest and without prejudice to AMT's position that it is entitled to the ODS. On January 19, 1988, plaintiff filed a complaint in this court contending that MARAD breached the ODSA contract.

## DISCUSSION

### I. *Contentions of the Parties*

The parties filed cross motions for summary judgment on the issues of whether the court has jurisdiction, and if so, whether the plaintiff is entitled to the subsidy under its ODSA.[1] In the first round of briefing, the defendant essentially adopted the position that MARAD developed in late 1987. In a series of letters between counsel for the plaintiff and MARAD, the agency consistently maintained that serious questions existed as to whether ODS could be paid to the plaintiff for shipments made under the subcharter with Israel. *See* Defendant's Cross-Motion for Summary

Judgment, Appendix Exhibits 15–25, at 202–230.

MARAD gave three reasons supporting its position: First, it stated that "the cargoes carried under the charter with the GOI [Government of Israel] cannot be considered 'commercial' cargoes" as required by the ODSA because in the Side Letter, Israel "agreed to ship 50 percent of grain cargoes on U.S.-flag vessels;" second, MARAD found that these shipments did not comply with section 601 of the Merchant Marine Act requiring the subsidized operation to "meet foreign-flag competition;" and third, MARAD stated that "[u]nder Section 605(c), the grant of subsidy must further the purposes and policy of the Act, which has long been held to mean increasing the total U.S.-flag carriage of cargo...." MARAD officials believed that these statutory requirements were not satisfied because the Side Letter "reserved" a fixed level of cargoes for shipment on U.S.-flag vessels. Letter of December 23, 1987, from James E. Saari, Secretary of the MSB to George J. Mannina, Jr., at 2, Defendant's Cross Motion for Summary Judgment, Appendix Exhibit 25, at 229.

The record before the court indicates that MARAD's position up until this litigation commenced, and afterwards, which was the position adopted by the defendant, was based on two errors. The first was a factual error that the ODSA specifically required the shipment of "commercial" cargoes. As previously discussed, the term "commercial" was dropped from the service description in the plaintiff's ODSA. The fact that the parties were relying on the wrong contract language, however, was not revealed until February 14, 1989, the day of the hearing on cross motions. Up until that hearing, both parties filed briefs with the court under the erroneous assumption that the service description of the ODSA included the term "commercial." The discovery of the true language of the ODSA thus deprived the defendant of one

---

1. The court is compelled to note that this was a difficult case to resolve because of the failure of the parties to focus on the relevant issues. With each brief, one party or the other inserted new facts or issues prompting voluminous responses, oppositions and supplements. The court has focused solely on those issues necessary to resolve this contract dispute.

of its central arguments for denying plaintiff's entitlement to the subsidy. Upon the discovery of this error, the hearing of February 14, 1989 was postponed, and the parties filed yet another round of voluminous briefs.

MARAD's denial of the subsidy payment was also based on an erroneous interpretation of the Side Letter. In MARAD's view, the Side Letter "reserved" cargoes for U.S. vessels because "[t]he GOI has agreed to ship 50 percent of grain cargoes on U.S.-flag vessels." MARAD thus concluded that the Side Letter created a fixed shipping obligation which failed to meet statutory requirements. It stated that "[s]ince the cargoes in question are reserved for U.S.-flag vessels, move at premium rates and will constitute AMT's annual service, there is no foreign-flag competition" as required by section 601. For the same reason, MARAD also concluded that "[s]ince these reserved cargoes will move in U.S.-flag vessels regardless of the grant of subsidy, the purposes and policy of the act would not be furthered...." in accordance with section 605. *Id.*

The defendant took MARAD's position a step further and alleged that the Side Letter is in fact contractual in nature amounting to a "commitment" or "guarantee" to ship fixed levels of cargoes on U.S.-flag vessels. The record before the court indicates that MARAD's interpretation of the Side Letter was erroneous. The arrangements established under the Side Letter, discussed in greater length *infra,* were agreed to voluntarily as a diplomatic gesture and do not obligate the government of Israel to a certain fixed level of shipping on U.S.-flag vessels. Thus, the record shows that the reasons asserted by MARAD in late 1987 and early 1988 for denying the subsidy were erroneous.

Nonetheless, the defendant attempts to salvage what remains of MARAD's position on subsidy payment. The defendant asserts that the plaintiff is not a real party in interest and does not have standing to seek recovery. Under the time charter agreement with Ultramar, AMT receives the full charter hire whether or not ODS is paid. Thus, the defendant argues, the plaintiff is not monetarily injured by the non-payment of ODS, is not a real party in interest, and does not have standing.

Realizing that the discovery of the actual language of the service description of the ODSA deprived the government of one of its principal defenses, the defendant argues, as a fall back position, that regardless of the contract language, "commercial" cargo carriage, in the sense that it meets foreign-flag competition, is a statutory requirement. Despite the ample record to the contrary, the defendant continues to maintain that cargoes transported to Israel under the Side Letter are "reserved"—not part of the competitive international shipping market or in furtherance of the policies of the Act—and thus not entitled to a subsidy. Finally, defendant inserted an entirely new issue in the case by contending that new information has come to the government's attention concerning plaintiff's citizenship which requires remand to MARAD.

The plaintiff contends that it is a real party in interest and does have standing. Plaintiff states that it is monetarily injured by the denial of subsidy payment, despite the fact that a recovery would be passed on to a third party—Ultramar. Plaintiff asserts that it faces economic harm through potential liability to Ultramar and the Government of Israel. The plaintiff also argues that MARAD should be equitably estopped from reversing its decision to pay ODS and from changing its determination that plaintiff is a U.S. citizen. Finally, the plaintiff alleges that MARAD breached the ODSA contract by refusing to pay ODS for the Israeli subcharter voyages.

## II. *Jurisdiction*

The defendant maintains that the plaintiff is precluded from prosecuting this action because it is not a "real party in interest" under Rule 17(a) of the United States Claims Court. The defendant also argues that the plaintiff does not have standing to sue because it is not in fact injured by the government's refusal to pay ODS. According to the defendant, because Ultramar

Shipping is responsible for the total actual vessel operating costs and actual bareboat charter hire, the plaintiff receives the same amount of money regardless of whether the subsidy is paid and is not injured by nonpayment. The defendant intertwines its real-party-in-interest and standing arguments. However, the two subjects, while related, require separate analysis.

### A. Real Party In Interest

■ Rule 17(a) of the United States Claims Court dictates that:

Every action shall be prosecuted in the name of the real party in interest.... [A] party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought....

RUSCC 17(a). Only a real party in interest can prosecute an action. *Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 662, 428 F.2d 1241, 1249 (1970). The rationale underlying the rule is to shield the defendant from subsequent suits on the same action and to give the judgment rendered proper *res judicata* effect. *See Proctor v. Gissendaner*, 579 F.2d 876, 880 (5th Cir.1978) (discussing Rule 17(a) of the Federal Rules of Civil Procedure, which is identically phrased). A determination of who is a real party in interest is made with reference to the substantive rights at issue. *Id.* Thus, a party who possesses the right sought to be enforced is a real party in interest, even though another party may be the beneficiary of the eventual recovery. *Id.*

■ The fact that the litigation may ultimately inure to the benefit of another will not bar a suit by a contractor. For example, a prime contractor may sue the government for damages even though the proceeds of the litigation are eventually passed on to a subcontractor. *See United States v. Blair*, 321 U.S. 730, 737–38, 64 S.Ct. 820, 823–24, 88 L.Ed. 1039 (1944). The United States Court of Claims allowed

prime contractors to sue the government for damages on behalf of subcontractors. *See Timber Investors, Inc. v. United States*, 218 Ct.Cl. 408, 416, 587 F.2d 472, 476 (1978); *Owens–Corning Fiberglas Corp. v. United States*, 190 Ct.Cl. 211, 236–40, 419 F.2d 439, 453–55 (1969). Accordingly, a plaintiff's right to sue is not defeated by the incidental obligation to distribute the fruits of the litigation to a third party.

The court concludes that although Ultramar will be the beneficiary of the recovery of ODS, the plaintiff remains the real party in interest under Rule 17(a) because, as signatory to the contract, it possesses the substantive contractual right being enforced. *Proctor*, 579 F.2d at 880. The defendant does not and can not successfully allege that it faces a danger of subsequent litigation in this action or that the suit will not have proper *res judicata* effect for the parties. Thus, a holding that the plaintiff is the real party in interest is completely consonant with the purpose of the rule. *Id.* Plaintiff entered into the contractual obligation with the defendant and Rule 17(a) states, "a party with whom or in whose name a contract has been made ... may sue in his own name without joining with him the party for whose benefit the action is brought." The defendant's argument that AMT is not the real party in interest is without merit. Simply put, AMT is the real party in interest because AMT is the party who signed and is performing the contract.

### B. Standing

The defendant also contends that the plaintiff lacks standing. The standing requirement of Article III of the Constitution confines the jurisdiction of federal courts to actual cases or controversies. U.S. Const. art. III, § 2, cl. 1. The United States Claims Court, although an entity of Article I of the Constitution, 28 U.S.C. § 171 (1982), applies the Article III standing requirements enforced by other federal courts.[2] In the Federal Courts Improve-

---

**2.** The Claims Court is specifically granted limited authority by Congress to render advisory rulings in congressional reference cases. 28 U.S.C. §§ 1492, 2509. Advisory rulings are not

ment Act of 1982, Pub.L. No. 97–164, § 105(a), 96 Stat. 25, 27, 28 (1982), Congress specified that judgments of the Claims Court be reviewed in the Court of Appeals for the Federal Circuit and the Supreme Court. 28 U.S.C. §§ 1295(a)(3), 1254. Under Article III of the Constitution, neither would be able to enforce such actions in the absence of a justiciable case or controversy. *See Glidden Company v. Zdanok*, 370 U.S. 530, 585–89, 82 S.Ct. 1459, 1491–93, 8 L.Ed.2d 671 (1962) (Clark, J., concurring); *Welsh v. United States*, 2 Cl.Ct. 417, 420–21 (1983).

■ A party who invokes the jurisdiction of a federal court must " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). Furthermore, the plaintiff must demonstrate that the injury is "identifiable" and "discernable." *Community Nutrition Institute v. Block*, 698 F.2d 1239, 1246 (D.C. Cir.1983), *rev'd on other grounds, Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).

■ The court concludes that the plaintiff's pleadings satisfy the standing requirements for federal court jurisdiction. The plaintiff is identifiably and discernably injured by the refusal of the government to make the ODS payments. This is true regardless of the fact that Ultramar is the eventual beneficiary of the recovery. Even though the plaintiff's contractual relationship with Ultramar provides that ODS payments will be passed on to Ultramar, plaintiff nonetheless suffers cognizable economic harm and has a sufficient stake in the outcome of this case for its suit to be considered a genuine and justiciable case or controversy.

The plaintiff is also injured by exposure to liability that may result from denial of ODS payments. Ultramar considers the ODS payments, which plaintiff confirmed Ultramar would receive, as a debt owed to it by the plaintiff. In addition, if the plaintiff failed to transport cargoes to Israel under its subcharter because of the government's refusal to pay ODS, the plaintiff could be liable for damages to the Government of Israel. The plaintiff's business relationship with Ultramar might also be injured. Ultramar may find it necessary to terminate the time charter. The court concludes that these factors clearly constitute sufficient threatened and actual economic harm to rise to the stature of Article III standing.

This is not a case in which a nominal plaintiff with a tenuous individual interest seeks to vindicate a very generalized or societal harm. *Compare Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S.Ct. 1361, 1368–69, 31 L.Ed.2d 636 (1972) (denying standing to organization that failed to show "a direct stake in the outcome" and sought only to "vindicate their own value preferences") *with United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973) (finding that organization alleging aesthetic injury had standing because its pleadings specified a "perceptible harm"). Accordingly, the court concludes that the plaintiff has standing to sue for the breach of its ODSA contract.

## III. *Entitlement to Operating Differential Subsidy*

### A. Estoppel

Plaintiff asserts that MARAD should be estopped from reversing its decision on plaintiff's entitlement to receive ODS and on the determination that it is a U.S. citizen that is qualified to receive the subsidy. Defendant contends that the September 8, 1987 letter was not a final agency action on which the plaintiff could reasonably rely, and thus the doctrine of equitable estoppel

considered actual cases or controversies under Article III. *Muskrat v. United States*, 219 U.S. 346, 362–63, 31 S.Ct. 250, 255–56, 55 L.Ed. 246 (1911).

is inapplicable. Defendant also contends that new information has come to the attention of the government concerning plaintiff's corporate structure that seriously calls into question its status as a U.S. citizen entitled to receive ODS. Defendant alleges that this citizenship issue is a jurisdictional matter and requests that the court remand the case to MARAD for a final determination.

■ The doctrine of equitable estoppel is referred to as a "shield" because it is used "to bar a party from raising a defense or objection that it otherwise would have, or from instituting an action which it is entitled to institute." *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir.1981). The elements of equitable estoppel are defined as follows:

> (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must have relied on the former's conduct to his injury.

*Emeco Industries, Inc. v. United States*, 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973) (quoting *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir.1970)).

The case of *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir.1973), well illustrates the application of the doctrine. In that case, the defendants' partnership was found to be qualified to receive payments as multiple persons under a subsidy program by an Agricultural Stabilization and Conservation Service committee. The defendants entered contracts in reliance on the committee's determination. Four years later, however, the committee determined that the defendants were not eligible for multiple-person status, and the government brought suit to recover the funds paid to them. The court held that the government was equitably estopped from bringing suit because allowing the government to change the defendants' status after the defendants detrimentally relied on the government's determination would work an injustice on them. *Id.* at 989–90. Thus,

the defendants in *Lazy FC Ranch* used the equitable estoppel doctrine to "shield," *Jablon*, 657 F.2d at 1068, against an action brought by the government.

■ The application of equitable estoppel to the plaintiff's claim for ODS is less clear. Plaintiff does not appear to utilize the doctrine "to bar a party from raising a defense or objection that it otherwise would have, or from instituting an action which it is entitled to institute." *Id.* Instead, it asserts detrimental reliance as a ground for recovery of the ODS. The essence of its estoppel argument is that MARAD's approvals and the September 8, 1987 letter constituted a promise to pay the ODS that should be enforced by the court because the plaintiff detrimentally relied on it. Such an argument sounds more of promissory than equitable estoppel. *Durant v. United States*, 16 Cl.Ct. 447, 450 (1988). The doctrine of promissory estoppel is used for enforcing promises which reasonably induce action or forbearance and which are held to be binding to the extent necessary to avoid injustice. *Id.* Thus, promissory estoppel is used as a "sword." *Jablon*, 657 F.2d at 1068. The principle is often asserted to enforce promises in the absence of a contract supported by consideration. *See* J. Calamari & J. Perillo, The Law of Contracts, § 6–7, 210 (2d ed. 1977). Suits based on the equitable doctrine of promissory estoppel, however, are not cognizable in the Claims Court. *Biagioli v. United States*, 2 Cl.Ct. 304, 308 (1983).

The plaintiff need not rely on estoppel to recover in this case. The parties do not dispute that the ODSA is a valid enforceable contract. As the Court of Claims stated "[c]ontracts for operating-differential subsidies are to be treated like any other commercial contract between the United States and a private party." *Farrell Lines Inc. v. United States*, 204 Ct.Cl. 482, 496, 499 F.2d 587, 596 (1974). The issue before the court is one of contract interpretation. The plaintiff can enforce its rights under the contract rather than have the court consider "justice and fair play" under an

estoppel theory. *Lazy FC Ranch*, 481 F.2d at 989.

■ The plaintiff also asserts that the government should be equitably estopped from reversing its determination made in 1986 that the plaintiff is a U.S. citizen—a prerequisite for receipt of ODS. The defendant argues that this citizenship question is a jurisdictional matter and that the court should remand the case to MARAD for a re-determination because new evidence has come to its attention. Defendant's jurisdictional allegations are without merit. The basis of the court's jurisdiction over the dispute is an express contract with the United States government. 28 U.S.C. § 1491. A plaintiff does not have to prove the pre-contract U.S.-citizenship requirements of the Merchant Marine Act in order to maintain a suit in the Claims Court to enforce a valid ODSA. The defendant has not cited any authority supporting this contention. Its reliance on *Jascourt v. United States*, 207 Ct.Cl. 955, 521 F.2d 1406 (1975), and the other cases cited is completely inapposite.

The court is not bound by the labels a party chooses for an action or by its characterization of an issue. *Parks v. United States*, 15 Cl.Ct. 183, 188 (1988); *Mason v. United States*, 222 Ct.Cl. 436, 442, 615 F.2d 1343, 1346 (1980). The defendant's request to reconsider the plaintiff's citizenship does not present an obstacle to the exercise of jurisdiction by the court. The defendant suggests that "AMT was formed solely for the purpose of 'fronting' for Ultramar PLC," a foreign firm, and that "the earlier citizenship determination by the agency arose out of a sham designed to benefit a non-citizen." Defendant's Opposition to Plaintiff's Motion to Dismiss Defendant's Request for Remand and Defendant's Opposition to Motion for Leave to Supplement the Record and Appendix, at 11–12. The court concludes that the defendant's reversal on this citizenship issue is in essence the assertion of a new contractual defense in the nature of either fraud or mutual mistake. *See Forest Environmental Services Co. v. United States*, 5 Cl.Ct. 774, 777 (1984) ("It is well settled that a party to a contract is bound by the terms thereof, unless there exists some defense, *i.e.*, fraud . . .."). The assertion of this defense is of no moment.

■ The court concludes that the plaintiff reasonably relied on MARAD's 1986 citizenship determination. MARAD officials either knew or should have known that such a determination would be relied on by the plaintiff. To allow the government to raise this defense would result in unjust injury to the plaintiff. The defendant has not convincingly demonstrated that new information concerning plaintiff's corporate structure requires remand. The record before the court indicates that all the information upon which the defendant now challenges the plaintiff's citizenship was known and available to the government at the time the plaintiff was originally approved. Much of the structure and arrangements questioned by the defendant were in fact imposed by MARAD. The doctrine of equitable estoppel "shields" a party from such unfair inconsistency. Accordingly, the defendant is equitably estopped from raising this defense at this juncture of the case.

### B. Breach of Contract

The legal relationship between the parties here arises under Operating Differential Subsidy Agreement No. MA/MSB–129. Accordingly, the principles of contract law will govern. In a similar case involving an ODS dispute, the Court of Claims stated, ". . . plaintiffs' eligibility for subsidy is governed by the principles of contract law and not by the auguries of agency discretion." *American Export Isbrandtsen Lines, Inc. v. United States*, 499 F.2d 552, 576, 204 Ct.Cl. 424, 464 (1974).

The dispute centers on Article I–2(a) of the ODSA which provides that AMT will receive ODS for the operation of the ULTRASEA and the ULTRAMAR:

[I]n world-wide carriage of liquid and dry bulk cargo in the foreign oceanborne commerce of the United States and in the carriage of such cargoes between foreign ports; *provided, that said vessels shall not carry liquid and dry bulk cargoes*

*subject to the cargo preference statutes of the United States....*

(Emphasis added.)

Under the terms of the ODSA, then, in order to receive ODS, the cash transfer program cargoes shipped to Israel under the subcharter must be exempt from the cargo preference law. The defendant admits that the cargoes in question are exempt from the cargo preference statutes. The defendant asserts, however, that because the Israeli cash transfer cargoes are "reserved" for U.S.-flag vessels at a level equal to those to which the CPA applies, that the court should treat them as preferred cargoes for the purpose of subsidization. The defendant also alleges that despite the deletion of the term "commercial" from the ODSA, the cargoes are required by statute to be "commercial," in the sense that they meet foreign-flag competition.

1. *Effect of the Cargo Preference Laws*

■ The Operating Differential Subsidy program is a "primary tool Congress sought to use in bringing American shippers to a parity with foreign competitors." *States Marine International, Inc. v. Peterson,* 518 F.2d 1070, 1076 (D.C.Cir.1975), *cert. denied sub nom., American Institute of Merchant Shipping, Liner Council v. American Maritime Association,* 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976). The program was designed to foster the development of, and encourage the maintenance of the United States merchant marine fleet. *Id.* Subsidies are paid to enhance the competitiveness of United States shippers in the world market. The cargo preference statutes set aside the shipment of certain cargoes and passengers and require that they be shipped by United States flag vessels. *Id.* at 1077. Such shipments are not entitled to subsidization because the purpose of the subsidy program—to enhance the competitiveness of U.S.-flag shippers—is not advanced by funding noncompetitive "preferred" shipments.

There is no dispute that Israeli cash transfer cargoes are not subject to the cargo preference laws. In *Council of American–Flag Ship Operators v. United*

*States,* 596 F.Supp. 160, 163 (D.D.C.1984) *aff'd without opinion,* 782 F.2d 278 (D.C. Cir.1986), the court specifically addressed the issue of whether the Cargo Preference Act applied to cash transfers to Israel. In holding that the CPA was not applicable to cash transfers, the court noted that after 1976 MARAD had taken the position that the CPA was applicable to the cash transfer program. On the other hand, AID maintained that the CPA was not applicable. To resolve the conflict, MARAD sought the opinion of the General Accounting Office (GAO). The GAO concluded that the cash transfer program and the Commodity Import Program were materially different. The GAO "distinguished the direct linkage of AID funds to commodities purchased under CIP and the 'unrestricted' aid furnished by cash transfers." *Id.* at 162. Moreover, "[t]he GAO was not persuaded that the requirement that Israel maintain purchasing levels in the United States requires or justifies application of the CPA, because 'shipments of nonmilitary exports ... cannot be identified as purchases made by Israel with American Funds.'" *Id.* (citing 59 Comp.Gen. 279, 283 (1980)).

The court in *Council of American–Flag Ship Operators* also noted congressional awareness of the issue and stated that "[i]t is plain that the Congresses which enacted those authorizations [for the cash transfers] had notice of the tension between the views of Maritime Administration and those of AID. If those Congresses had decided to make the CPA apply to cash transfers, exposition of that preference would have been a simple matter." *Id.* at 164 (citing *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381–82, 89 S.Ct. 1794, 1801–03, 23 L.Ed.2d 371 (1969); *United States v. Bergh,* 352 U.S. 40, 46–47, 77 S.Ct. 106, 109–10, 1 L.Ed.2d 102 (1956)). There can be no question, therefore, that the CPA, and its substantive requirements, have absolutely no application to the cargoes at issue in this case.

Therefore, the only contractual requirement of the service description in Article I–2(a) of the ODSA—that the cargoes are not subject to the cargo preference law—is satisfied. Indeed, in its letter of September 8, 1987, MARAD indicated that the only restriction on the payment of ODS was that "ODS is not payable for periods during which the vessel transports dry bulk cargo subject to the cargo preference statutes...." The defendant agrees that the CPA does not apply to the cash transfers. It asserts, however, that the cargoes shipped under the cash transfer program are "reserved" for transport by U.S.-flag vessels pursuant to a Side Letter. Such "reserved" cargoes, defendant contends, do not meet foreign-flag competition and should be treated as preference cargo and not be subsidized.

### 2. Foreign–Flag Competition

Although the requirement that subsidized cargoes be "commercial" in nature was eliminated as a contractual requirement, the defendant argues that foreign-flag competition is mandated by statute.[3] The defendant correctly emphasizes that the court may not enforce a contract in contravention of a statute. Section 601(a) of the Merchant Marine Act, 46 U.S.C.App. § 1171(a), states that the purpose of the legislation is to enhance the competitiveness of American shippers. For instance, before a subsidy is payable, the Secretary of Transportation must determine that the operations of proposed subsidized vessels are designed to "meet competitive conditions and promote foreign commerce." 46 U.S.C.App. § 1171(a)(3).

The defendant maintains that the subcharter cargoes are "reserved" under the Side Letter with Israel and are not engaged in foreign-flag competition. Defendant contends that the cargoes should be treated as though they were subject to the CPA and suggests that had this type of cargo reservation arrangement existed when the ODSA was entered into, "it is apparent

that such cargoes would have been treated identically with statutory preference cargoes." The defendant relies on the statements of MARAD's Chief of the National Cargo Division, S. Thomas Romeo, who indicated that more than fifty percent of the cargoes shipped to Israel under the cash transfer program are shipped on U.S.-flag vessels under the Side Letter. Because this fifty percent watermark is the same as the level of cargoes to which the CPA applies, the defendant argues that the shipments should be treated as though they were preference cargoes, and not subsidized.

Although a substantial portion of the commodities being shipped to Israel is apparently carried on U.S.-flag vessels, the court concludes that the Side Letter by no means *mandates* such shipment on U.S. vessels. The relationship created by the Side Letter is apparently a diplomatic reciprocal courtesy, or as plaintiff puts it "a voluntary foreign policy gesture," rather than a fixed shipping obligation. The defendant repeatedly suggests that the Side Letter is in fact a contractual obligation mandating preference cargo levels of U.S.-flag shipping for Israeli cash transfer shipments. It is clear, as indicated by the numerous affidavits submitted by the plaintiff, that Israel remains free to contract with shippers of any nation to carry agricultural commodities purchased under the cash transfer program.

The record indicates that the Side Letter arrangement is voluntary in nature. Shmuel Strauss, Director of Israel Supply Mission, stated in an affidavit that the "sole intent of the Side letter is to affirm that Israel will attempt to assure U.S.-flag vessels a fair share of the market for the bulk shipment of grain." According to Strauss, the letter was "voluntarily signed" by Israel. The Israeli Economic Minister, Pinhas Dror, stated in a letter to AID that Israel "voluntarily signed the Side Letter."

---

**3.** In the original round of briefing, the parties addressed the alleged contractual requirement that the cargoes be "commercial" from the perspective of whether the vessels were engaged in foreign-flag competition. The term "commer-

cial" was equated with foreign-flag competition. Upon learning that the term "commercial" was not contained in the contract, the parties thereafter focused on the issue solely as the statutory requirement for foreign-flag competition.

This view is supported by statements of other Israeli officials and is shared by AID and the Government Accounting Office. Strauss also stated:

> Without the payment of operating differential subsidy, which substantially lowers U.S.-flag rates, Israel would not have entered into the long-term Consecutive Voyage Charter Agreement dated July 30, 1987 and certain portions of the cargoes now being shipped under that agreement and on other U.S.-flag vessels *would have been shipped on foreign-flag vessels because of competitive conditions in the world shipping market.* (Emphasis added).

Also, numerous letters between Israeli and United States officials show that the Side Letter was furnished specifically because the cash transfer program was not subject to the cargo preference laws, and hence, subsidizable. Accordingly, the court concludes that for the purpose of interpreting the ODSA, the statutory requirement that cargo transport service meet foreign-flag competition does not present an obstacle to the payment of ODS.

The defendant essentially urges the court to expand the definition of the term "preference" cargo in the contract to include a new amorphous category of cargo it labels "reserved." Such an approach would amount to reading a contractual term into the ODSA that is not there—one that is not supported by the contract history. It must be re-emphasized that this is strictly a contract interpretation case, and the contract requires the government to pay ODS. The court is not swayed by the "auguries of agency discretion" urged by the defendant. *American Export*, 204 Ct.Cl. at 464, 499 F.2d at 576. The defendant's numerous other arguments are likewise without merit. MARAD is, of course, empowered to redefine shipping arrangements that will be subsidized, and administrative rule-making procedures are available for that function. However, this court cannot perform a function delegated by Congress to the agency.

## CONCLUSION

AMT and MARAD are parties to a valid, enforceable contract. Article I–2(a) of the ODSA requires "that said vessels shall not carry liquid and dry bulk cargoes subject to the cargo preference statutes of the United States...." This contractual condition is satisfied. The court also concludes that the statutory requirement that the cargo carriage meet foreign-flag competition does not present an obstacle to payment of ODS under the contract. The plaintiff, therefore, is entitled to receive the subsidy as provided for by the ODSA. For the reasons stated above, plaintiff's motion for summary judgment is granted, and defendant's cross-motion for summary judgment is denied. The parties shall file a joint stipulation of damages with the Clerk's Office within 30 days from the date of this opinion.