**JOANN COAL COMPANY,**
**Plaintiff–Appellee,**

**v.**

**UNITED STATES of America,**
**Defendant–Appellant.**

**No. 88–2874.**

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1989.

Decided Aug. 18, 1989.

Rehearing and Rehearing In Banc Denied
Sept. 21, 1989.

Charles Bricken (William S. Rose, Jr.,
Asst. Atty. Gen., Gary R. Allen, Gilbert S.
Rothenberg, Tax Div., Dept. of Justice, Mi-

chael W. Carey, U.S. Atty., on brief) for
defendant-appellant.

Robert Stephen Kiss (Gorman, Sheatsley
& Hutchison) for plaintiff-appellee.

Before WILKINSON, Circuit Judge,
HAYNSWORTH and BUTZNER, Senior
Circuit Judges.

HAYNSWORTH, Senior Circuit
Judge:

This is a suit for the refund of excise
taxes paid by one alleged to have been the
"producer" of coal. In the district court,
judgment went for the taxpayer, and the
United States has appealed.

We reverse.

## I.

The Black Lung Benefits Revenue Act of
1977, *see* 26 U.S.C.A. § 4121 (1989), im-
posed an excise tax upon producers of coal
for the purpose of funding black lung bene-
fits to miners who would not be compensat-
ed directly by their employers.

The statute does not define the term
"producer" but Treas. Reg.
§ 48.4121–1(a)(1) (1988) defines it as "the
person in whom is vested ownership of the
coal under state law immediately after the
coal is severed from the ground." The
regulation provides that one should dis-
regard any contractual arrangement for
the sale or other disposition of the coal or
the payment of any royalties. In order to
determine ownership of the coal immediate-
ly after severance one must look to the
contractual or other legal relationship be-
tween multiple parties. We do not under-
stand the restriction in the regulation as
intending to limit that inquiry, but only to
inhibit attempts by actual producers by
contract to transfer the incidence of the
tax. Hence, we look to the actual arrange-
ment between the relevant parties.

## II.

In 1974 Piney Creek Coal Company, as
owner or lessee, controlled some coal pro-
ducing lands in West Virginia. In that
year it entered into an agreement with

JoAnn Coal Company under which JoAnn would mine coal on lands controlled by Piney Creek and would deliver the severed coal to Piney Creek. JoAnn would be paid $23 per ton for clean coal delivered to Piney Creek under this arrangement. JoAnn was responsible for providing all the labor, supplies, material and equipment used in mining the coal. Piney Creek was responsible for payment of other costs, such as those incurred in loading and shipping the coal and welfare payments to the United Mine Workers of America.

Under the 1974 arrangement, it is clear that JoAnn was a contract miner of coal owned by Piney Creek immediately upon severance. The Internal Revenue Service made no contrary contention, and it is clear that JoAnn had no power of disposition over the severed coal. It could only deliver the severed coal to Piney Creek and collect its charge of $23 per ton for its contract services.

In 1979 Piney Creek began experiencing difficulties in finding purchasers for the coal being mined by JoAnn. JoAnn, however, had access to potential purchasers to whom it could sell the coal it was producing. This development led to a new letter agreement modifying the 1974 arrangement. Instead of delivering the severed coal to Piney Creek and collecting its fee of $23 per ton, the new arrangement gave JoAnn the right to sell the coal it mined. It was to pay Piney Creek $9.22 per ton for mined and removed coal, but Joann could then remove the coal and deliver it to whomever JoAnn pleased, JoAnn could sell the coal for the highest prices it could obtain.

Under the 1979 letter agreement JoAnn was required to report its sales to Piney Creek. As to each sale, it reported to Piney Creek the quantity of coal sold, the sales price and the identity of the buyer.

Under the 1979 arrangement Piney Creek was responsible for paying royalties and wheelage charges, but JoAnn was responsible for all other costs of extraction, preparation and shipment of the coal to its customers. It was also responsible for all required payments to the United Mine Workers of America and to its Pension and Benefit Trust.

The 1979 letter agreement provided that it could be cancelled by either party upon notice of 48 hours. Piney Creek did cancel the arrangement in January, 1981.

Neither JoAnn nor Piney Creek filed coal excise tax returns for the period of June 1979 to January 1981. In connection with a later audit of JoAnn's income tax returns the Internal Revenue Service discovered the nonpayment of excise taxes and assessed them against JoAnn for the period under which the parties operated under the June 1979 letter agreement.

### III.

With only a general reference to the 48-hour termination provision and the sales reports required of JoAnn, the district court concluded that JoAnn's control of the coal "was far from unfettered or unrestrained." That finding led to the unelaborated conclusion that JoAnn never owned the coal. The judge's reliance was upon *McClure v. Cook*, 39 W.Va. 579, 20 S.E. 612 (1894). Here, with some elaboration, JoAnn contends that the reserved right of termination on 48-hours' notice and the requirement of reports by it of its sales requires the conclusion that it was not the owner of the coal it mined under the 1979 letter agreement. It suggests that if demand for the coal increased and its selling price went up Piney Creek would cancel the arrangement. Conversely, if the market weakened, JoAnn would cancel it.

We accept these musings as a realistic appraisal of the economic situation, but they do not lead to the conclusion that JoAnn was not the owner of the coal. We are concerned here with the ownership of the coal mined by JoAnn during the existence of the 1979 letter agreement. The reporting requirements coupled with the right of termination demonstrates that there was substantial impermanence in the arrangement, but the fact that JoAnn's license to mine, remove and sell the coal might be cancelled at some date in the future has little bearing upon its legal

rights to deal with the coal during the continuance of that agreement. JoAnn's power of disposition and its control over the coal mined pursuant to its license is not diminished by the fact that it may not have comparable power to deal with any coal after expiration of its license. As long as the license is in effect, rights flow from it; they need not be brushed aside because of the fact that the license may be terminated at some unspecified time in the future.

While a license to mine coal may not last forever, here, as in general, when the licensee, acting lawfully under the license, removed coal from the ground, the separated coal immediately became the property of the licensee. *See United States Coal & Oil Co. v. Harrison*, 71 W.Va. 217, 76 S.E. 346, 346 (1912); *see also Bostic v. Bostic*, 199 Va. 348, 99 S.E.2d 591, 596–97 (1957).

### IV.

Here JoAnn contends that under the 1979 letter agreement it did no more than serve as a contract miner while acting as sales agent for Piney Creek.

It may be that the 1979 letter agreement grew out of the fact that Piney Creek had been experiencing difficulty in selling its coal while JoAnn could sell it more successfully. The parties did not enter into a sales agency relationship, however. One would expect that kind of relationship to provide for continued payments by Piney Creek to JoAnn for its services as contract miner plus compensation for sales made by JoAnn on Piney Creek's account. That was not done, however. Under the 1979 letter agreement JoAnn paid Piney Creek on a tonnage basis for a license to mine and remove coal. The removed coal JoAnn sold for its own account, not that of Piney Creek. For the coal it could charge as much as the market would permit, and it was not accountable to Piney Creek for any portion of sales revenues.

It is true that it was required to report its sales to Piney Creek. The reports did inform Piney Creek's appraisal of its interest in continuing the licensing arrangement or exercising its right of termination, but the reports gave Piney Creek no right to a

share in the proceeds of JoAnn's completed sales. As long as the 1979 letter agreement was in effect JoAnn sold for its own account and was legally and equitably entitled to retain the proceeds, however great or small they were.

During the continuance of the 1979 letter agreement JoAnn had the right to exercise dominion over all coal mined by it. Indeed, its right of dominion over coal severed by it was exclusive.

### V.

Since it appears that JoAnn as licensee was the owner of the coal it extracted under West Virginia law, it was the producer of that coal within the meaning of § 4121 and subject to the excise tax.

REVERSED.