**EMERALD INTERNATIONAL CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 01–258T.

United States Court of Federal Claims.

Dec. 13, 2002.

Lev K. Martyniuk, Crescent Springs, Kentucky, for the plaintiff.

Robert C. Stoddart, U.S. Department of Justice, Washington, D.C., with whom was Mildred L. Seidman, U.S. Department of Justice, for the defendant.

## OPINION

ALLEGRA, Judge.

Plaintiff is a domestic coal broker that purchased millions of tons of coals during the years in suit. The price it paid for that coal included the cost of the coal excise tax imposed on coal producers under 26 U.S.C. § 4121(a), often reflected as a separate line item on its bill. Much of this coal was to be resold to foreign purchasers at or near the time of these purchases. Plaintiff brings this suit to recover the amounts it paid on account of the excise tax, asserting that the imposition thereof on its coal violated the Export Clause of the Constitution, art. I, § 9, cl. 5. The case is before the court on defendant's motion for summary judgment, in which defendant asserts, *inter alia*, that plaintiff lacks standing to sue. For the reasons that follow, the court **GRANTS** this motion.

### I. Facts

Emerald International Corporation (Emerald or plaintiff), an Ohio corporation, is a seller and exporter of coal. From January 1, 1995, through March 31, 1998, Emerald purchased coal from vendors within the United States and then exported it to customers in Europe, South America, Asia, and Africa. According to plaintiff, ninety-five percent of this coal had a foreign customer identified at the time of its purchase: either there was a foreign buyer already contracted to buy the coal, Emerald was in contract negotiations with one or more foreign purchasers for the sale, or Emerald had identified potential purchasers among the coal companies with whom it had prior dealings. Plaintiff further alleges that, in many instances, the coal exported by it was shipped directly from barge to vessel without passing through an export staging area, and in the remaining instances, the purchased coal was shipped to a deepwater export terminal as part of an industry practice necessary for physically loading it onto an ocean vessel.[1]

---

1. While the parties generally agree upon the facts in this case, they disagree as to the process by which the coal was exported and entered the stream of export. For example, defendant insists that Emerald purchased the coal on its own account then sold it, pointing to a joint status report in which Emerald stated that it purchased coal for its own account, negotiated written agreements for the exportation of the coal, and accepted the financial risks of not being able to sell the coal. For the reasons discussed below, these factual issues prove immaterial to this court's decision.

Plaintiff seeks to recover an amount corresponding to excise taxes it allegedly paid on the exported coal under the Black Lung Excise Tax, 26 U.S.C. § 4121 (the Coal Tax). Emerald did not itself produce any of the subject coal and never paid any Coal Tax thereon directly to the United States. Nonetheless, it alleges that it bore the economic burden of the tax when the domestic producers from which it purchased the coal included the Coal Tax in the sale price, often as a separate line item, and then remitted the amounts collected from Emerald to the IRS. For its part, Emerald asserts that it did not regularly pass this tax on to its consumers.

To declare and remit the Coal Tax, an excise tax return must be prepared and filed quarterly with respect to sales made during that period. Emerald did not file any such returns for any of the relevant periods. However, it filed two claims for refund with the IRS, seeking the return of Coal Taxes allegedly paid: The first claim was filed on or about January 31, 2001, for the fourth quarter of 1997 and in the amount of $334,849.10; this claim was denied by the IRS on or about April 9, 2001. The second was filed on or about April 30, 2001, for the first quarter of 1998, in the amount of $300,970.45; it was denied on or about July 12, 2001. Emerald apparently did not file refund claims for any of the other taxes at issue here.

On April 30, 2001, Emerald filed a complaint with this court in which it avers that: (i) the Coal Tax imposed on the transactions in question violated the Export Clause; (ii) the imposition of the tax effectuated a taking under the Takings Clause of the Fifth Amendment; and (iii) the government's retention of the taxes violates an implied contract to return funds collected unconstitutionally. Emerald requests the return of the tax payments collected on account of its export sales made between January 1, 1995, and March 31, 1998, together with interest. Additionally, plaintiff seeks recovery of its costs, expenses, and attorney's fees, as well as a declaration that the Coal Tax is unconstitutional as applied to Emerald's export sales.

On February 1, 2002, defendant filed a motion for summary judgment. Following briefing, oral argument on this motion was held August 22, 2002.

## II. Discussion

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must determine whether the evidence presents a disagreement sufficient to require submission to fact-finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 250–52, 106 S.Ct. 2505.

Plaintiff asserts four theories for recovery here: a damages claim based upon the money-mandating language of the Export Clause; a takings claim arising under the Fifth Amendment; an illegal exaction claim; and, finally, a claim based upon an implied contract. The court will review *seriatim* the viability of each of these potential paths to recovery.

### A. Suit for Damages under the Tucker Act

Plaintiff first asserts that it is entitled to damages stemming from its payment of an excise tax whose imposition was unconstitutional under the Export Clause of the Constitution, art. I, § 9, cl. 5. In so arguing, plaintiff invokes *Cyprus Amax Coal Co. v. United States,* 205 F.3d 1369 (Fed.Cir.2000), *cert. denied,* 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001), in which the Federal Circuit held that this court had jurisdiction under the Tucker Act, 28 U.S.C. § 1491 over such a suit.[2] For its part, defendant agrees

---

**2.** To invoke jurisdiction under the Tucker Act, a party must point to a complementary substantive right found in another source of federal law, such as the Constitution, federal statutes, or executive regulations. *See United States v. Mitch-* *ell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). That substantive right must be fairly interpreted as mandating compensation by the Federal Government for the damages sustained. *Id.* at 216–17, 103 S.Ct. 2961. Defen-

that the Coal Tax is unconstitutional when imposed on exported coal,[3] but disagrees that the coal at issue was in the stream of export at the time the tax was imposed, so as to render the Coal Tax, as imposed here, unconstitutional. More fundamentally, defendant asserts that plaintiff lacks standing to raise its damages claim and that, at all events, its assertions fail to state a claim under RCFC 12(b)(6).

Though its mere mention strikes trepidation in the stoutest judicial heart, "standing" is a threshold issue in every case, involving whether the court has the power to entertain the suit. "Fundamentally," the Federal Circuit has stated, "the question of standing involves the determination of whether a particular litigant is entitled to invoke the jurisdiction of a federal court to decide the merits of a dispute or of particular issues." *McKinney v. U.S. Dept. of Treasury*, 799 F.2d 1544, 1549 (Fed.Cir.1986); *see also Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This inquiry focuses not on the merits of the issue raised, but on the "qualifications and status of the party seek-

ing to bring [its] complaint before a federal court." *McKinney*, 799 F.2d at 1549; *see also Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). It reflects both constitutional or statutory limitations on federal court jurisdiction, as well as prudential reservations on its exercise. *Warth*, 422 U.S. at 498, 95 S.Ct. 2197.[4] The United States Court of Federal Claims, though an Article I court, 28 U.S.C. § 171, applies the same standing requirements enforced by other Federal courts. *See Glass v. United States*, 258 F.3d 1349, 1355–56 (Fed.Cir.2001); *Landmark Land Co. v. United States*, 256 F.3d 1365, 1380 (Fed.Cir.2001); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1290 (Fed.Cir.1999); *CW Government Travel, Inc. v. United States*, 46 Fed. Cl. 554, 557–58 (2000); *American Maritime Transport, Inc. v. United States*, 18 Cl.Ct. 283, 290–91 (1989).[5]

■ The basic calculus of constitutional standing requires an injury in fact caused by the defendant and redressable by the court. Thus, a party bringing a constitutional chal-

dant contends that *Cyprus Amax, supra,* did not find that the Export Clause is such a "money-mandating" provision that would support the filing of a suit for damages under the Tucker Act, 28 U.S.C. § 1491. This court recently rejected an identical claim in *Usibelli Coal Mine v. United States*, 54 Fed.Cl. 373 (2002). There, after extensively reviewing the opinion in *Cyprus Amax*, this court found that the Federal Circuit "viewed the Export Clause as a money-mandating provision that authorized the award of money damages, thereby allowing a claimant to file an action based directly on that clause." *Id.* at 379.

3. *See* I.R.S. Notice 2000–28, 2000–21 I.R.B. 1116, 2000 WL 655005 (May 22, 2000) (citing *United States v. Int'l Bus. Machines Corp.*, 517 U.S. 843, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996) and *Ranger Fuel Corp. v. United States*, 33 F.Supp.2d 466 (E.D.Va.1998)).

4. The court must first determine that the litigant satisfies the core standing requirements to assure itself that it has the judicial power to address the litigant's claims. *Simon*, 426 U.S. at 39, 96 S.Ct. 1917. Then, it must determine whether any prudential limitations restrain the court from exercising that power. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475–76, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Gladstone Realtors, et al. v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

5. Although well established in the case law, it might seem odd, at first blush, that a constitutional doctrine ingrained in Article III of the Constitution would be applied to an Article I court. Several reasons, however, militate in favor of such an application. First, the Supreme Court has indicated that Article I courts, like their Article III counterparts, exercise the judicial power of the United States. *See, e.g., Freytag v. Commissioner,* 501 U.S. 868, 889, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). Second, the statute empowering this court to enter final judgments specifically refers to "case or controversy," 28 U.S.C. § 2519, thereby appearing to invoke the Article III requirements. *See CW Government Travel,* 46 Fed.Cl. at 557–58. Finally, Congress has specified that judgments of this court are reviewable by the Court of Appeals for the Federal Circuit and, ultimately, the Supreme Court, both Article III tribunals that would be unable to perform such review absent a justiciable case or controversy. *See American Maritime Transport,* 18 Cl.Ct. at 291; *Welsh v. United States,* 2 Cl.Ct. 417, 420–21 (1983). At all events, if not constitutionally mandated, application of the standing doctrine would still be appropriate on prudential grounds, unless jurisdiction granted by Congress required otherwise. *See, e.g., Zevalkink v. Brown,* 102 F.3d 1236, 1243 (Fed.Cir.1996).

lenge must demonstrate that it "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone,* 441 U.S. at 99, 99 S.Ct. 1601, that the injury "fairly can be traced to the challenged action" and is "likely to be redressed by a favorable decision." *Simon,* 426 U.S. at 38, 41, 96 S.Ct. 1917; *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *First Hartford,* 194 F.3d at 1290; *McKinney,* 799 F.2d at 1550. "This triad of injury in fact, causation, and redressability," the Supreme Court recently illuminated, "comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel,* 523 U.S. at 103–04, 118 S.Ct. 1003. Plaintiff bears the burden of meeting these requirements, which in the context of a summary judgment motion, requires it to "set forth" by affidavit or other evidence "specific facts" in support of standing, rather than "mere allegations." RCFC 56(e); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).

■ Applying this tripartite test, the decisive factor here appears to be causation— whether any economic injury experienced by plaintiff was "fairly traced" to the imposition of the Coal Tax. In describing this causation requirement, the Supreme Court has often differentiated between direct and indirect harms, with obstacles to standing arising "when a person is harmed indirectly by government action that directly involves someone else." Michael Asimow, Arthur Earl Bonfield, & Ronald M. Levin, State and Federal Administrative Law 648 (2d ed.1998). Thus, for example, in *Lujan,* the Court opined:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction and perhaps on the response of others as well."

504 U.S. at 561–62, 112 S.Ct. 2130 (emphasis in original). The Court further observed that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id.* at 562, 112 S.Ct. 2130 (quoting *Allen,* 468 U.S. at 758, 104 S.Ct. 3315); *see also* Cass R. Sunstein, "What's Standing After Lujan? Of Citizen Suits, 'Injuries,' and Article III," 91 Mich. L.Rev. 163, 200 (1992).

As will be discussed further below, the instant case involves indirect harm. Nonetheless, in *Lujan* and elsewhere, the Supreme Court has recognized that the injury to a plaintiff may be the consequence of government action affecting the acts or decisions of a third party which, in turn, cause injury to the plaintiff. Many of the Court's authorities on this point were construed in *Animal Legal Defense Fund v. Quigg,* 932 F.2d 920 (Fed.Cir.1991), which involved economic injuries similar to those alleged here. In that case, individual farmers, animal husbandry groups and animal protection organizations filed suit challenging a rule promulgated by the Commissioner of the Patent and Trademark Office stating that nonnaturally occurring, man-made living microorganisms, including animals, are patentable subject matter. The farmers and animal husbandry groups alleged, *inter alia,* that the new rule would increase their cost of operations by forcing them to pay royalties to purchase patented, genetically altered animals, thereby decreasing their profits. The district court dismissed the case for failure to state a

claim, 710 F.Supp. 728 (N.D.Cal.1989), thereby obliging the Federal Circuit, on appeal, to assume that the injuries asserted in the complaint were true, which assumption, in turn, satisfied the injury-in-fact requirement of the standing doctrine.

Focusing on causation, however, the court held that the identified economic injuries could not be attributed to the Commissioner's allegedly unlawful issuance of patents. In so concluding, the Federal Circuit considered a number of the Supreme Court decisions previously cited herein, among them *Allen, supra,* Simon, *supra,* and *Warth, supra.* Of these, the court identified *Simon* as best-exemplifying the Court's approach to such cases, observing that in that case, the Supreme Court—

> found plaintiffs without standing because the injury depended upon independent actions of third parties, not before the court, which were speculative, that is, not controlled by the government action. Under such circumstances, the injury is not 'fairly traceable' to the government's action. As stated in *Simon,* 426 U.S. at 41–42, 96 S.Ct. 1917, ... '[A] federal court act[s] only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'

932 F.2d at 932–33.[6] As to the plaintiffs' claim that the Commissioner's actions would necessarily increase their costs, the court found that the "farmers cannot be forced to purchase improved animals and pay the premium (*i.e.,* 'royalty') which the farmers say is likely to be asked." 932 F.2d at 934. Moreover, the court found "at best speculative" the notion that the costs of their operations would necessarily increase by reason of the payment of any royalties, finding instead that the farmer's costs would be impacted by market factors unrelated to defendant's conduct. *Id.* It concluded that, "following the Supreme Court's reasoning in *Simon,* we conclude that the alleged economic injuries of individual farmers and farm organizations are not 'fairly traceable' to the allegedly erroneous interpretation of the statute by the Commissioner." 932 F.2d at 936.[7]

Now one might argue that *Animal Legal Defense Fund* differs from the case *sub judice* in that the economic injury there was prospective. But, in fact, the Federal Circuit, in reviewing the trial court's dismissal order, assumed that the injuries alleged would occur. It found that the farmers lacked standing, then, not because they would not be injured-in-fact, but because any

---

**6.** In *Simon,* the Court held that indigents who had been denied care by hospitals could not challenge new IRS criteria for affording tax exempt status to such organizations without their providing nonemergency care to indigents, stating that "it is purely speculative whether the denials of service specified in the complaint fairly can be traced to [the IRS] or instead resulted from decisions made by the hospitals without regard to the tax implications." 426 U.S. at 42–43, 96 S.Ct. 1917.

**7.** The Federal Circuit's decision derived support from several other cases discussed by the court. For example, *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), involved a Texas statute that provided for up to two years of incarceration for any father who refused to pay child support. When a mother challenged the failure of the district attorney to enforce the statute against the father of her child, the Court found that there was no causal relationship between the prosecutor's refusal to act and the injury, finding it only "speculative" that the prospect of the prosecution would lead to the desired outcome. 410 U.S. at 618, 93 S.Ct. 1146. In

*Allen, supra,* the court held that parents of black children had no standing to seek review of the adequacy of the Internal Revenue Service's enforcement of prohibitions on providing tax subsidies to segregated private schools. The Court rejected the claim that the policy encouraged segregated schools stating:

> It is entirely speculative ... whether withdrawal of a tax exemption from any particular school would lead the school to change its policies ... [and whether] any given parent ... would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status.

468 U.S. at 758, 104 S.Ct. 3315. Finally, in *Warth, supra,* the Court found that individuals with low or moderate income could not challenge an ordinance that had the apparent effect of excluding low or moderately priced housing from a locale, finding that the individuals had not established that apart from the ordinance they would have been able to locate affordable housing. 422 U.S. at 515–16, 95 S.Ct. 2197.

such injuries would not be fairly traceable to the United States, due to the intervention of third parties. The rationale underlying this holding was buttressed by later Supreme Court decisions, among them, *Lujan*, in which the Court stated that to demonstrate causation under the constitutional standing doctrine, there must be a "causal connection between the injury and the conduct complained of," and correspondingly, the injuries must not be " 'the result of the independent action of some third party not before the court.' " *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (quoting *Simon*, 426 U.S. at 41–42, 96 S.Ct. 1917).[8] Further *post hoc* support for the Federal Circuit's decision may be found in *Bennett v. Spear*, 520 U.S. 154, 168–69, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), which states that standing may exist where the plaintiff's injury produced by some third party action is the result of the "determinative or coercive effect" of a government action directed at the third party.[9]

For its part, plaintiff has failed to establish the requisite causal connection between its alleged harm and the imposition of the Coal Tax. By its terms, that manufacturer's excise tax was imposed not upon plaintiff, but upon the producers of the coal.[10] Thus, unlike excise taxes imposed on such things as airline tickets, the coal producers here did not act as a collecting agent for the United States.[11] Further, there was no statutory or regulatory obligation for the producers to pass the tax along to plaintiff,[12] nor, certainly, any requirement that plaintiff agree to transactions specifically including the tax. Indeed, nothing prevented the coal producers from paying the tax, absorbing the impact thereof and themselves pursuing a refund suit—indeed, numerous cases pending in this court present this exact scenario. Accordingly, every indication is that any economic harm experienced here by plaintiff was not the direct result of the Coal Tax, but rather derived from actions independently taken by the third-party producers.

Similar observations were recently made by this court in resolving an analogous standing issue in *Ammex, Inc. v. United States*, 52 Fed.Cl. 303 (2002), *reconsideration denied*, 52 Fed.Cl. 555 (2002). There, this court held that the purchaser of gasoline and diesel for resale at a duty free facility did not have

---

8. *See also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir.2000) ("The traceability prong means it must be likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court."); *American Coalition for Competitive Trade v. Clinton*, 128 F.3d 761, 764 (D.C.Cir. 1997) ("there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.").

9. *See also Tennessee Valley Authority v. U.S. E.P.A.*, 278 F.3d 1184, 1207 (11th Cir.2002); *Telephone and Data Systems Inc. v. F.C.C.*, 19 F.3d 42, 47 (D.C.Cir.1994) ("we need not attempt any broad explication of the justiciability of indirect injury, for one narrow proposition at least is clear: injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality").

10. *See generally Amax Coal Co. v. United States*, 959 F.Supp. 990, 991–93 (S.D.In.1996) (describing history and purpose of tax). This conclusion also finds support in the Treasury's regulations. *See* 26 C.F.R. § 48.4121–1(a)(1)–(2); *see also*

*Joann Coal Co. v. United States*, 883 F.2d 5 (4th Cir.1989). Further indication that the tax is imposed on the producer may be found in 26 U.S.C. § 4218, which provides that "[i]f any person manufactures, produces or imports an article . . . and uses it . . . then he shall be liable for tax under this chapter in the same manner as if such article were sold by him." *See Mulga Coal Co., Inc. v. United States*, 825 F.2d 1547 (11th Cir. 1987).

11. In the case of the airline ticket tax, 26 U.S.C. § 4291 specifically imposes the collection responsibility on the persons receiving payment for travel services. *See Brennan v. Southwest Airlines Co.*, 134 F.3d 1405 (9th Cir.1998). No similar provision exists here.

12. Indeed, as observed by the Court of Claims in another excise tax case, " '[t]he phrase 'passed the tax on' is inaccurate, as obviously the tax is laid and remains on the manufacturer and on him alone. . . . The purchaser does not pay the tax. He pays or may pay the seller more for the goods because of the seller's obligation, but that is all.' " *Dow Jones & Co. v. United States*, 130 Ct.Cl. 696, 128 F.Supp. 748, 749 (1955) (quoting *Lash's Products Co. v. United States*, 278 U.S. 175, 176, 49 S.Ct. 100, 73 L.Ed. 251 (1929)); *see also Gurley v. Rhoden*, 421 U.S. 200, 204–05, 95 S.Ct. 1605, 44 L.Ed.2d 110 (1975).

standing to lay claim to the tax imposed on such fuel allegedly in violation of the Export Clause. In so holding, this court stated that "[w]here the defendant by direct act has not laid any tax or duty upon the plaintiff, and no such act is fairly traceable to the defendant (since the incidence of the tax was upon the supplier(s)), plaintiff cannot establish an injury in fact caused by the defendant." *Id.* at 311. On reconsideration, the court reaffirmed its standing ruling, again focusing on the fact that the tax in question was imposed on the gasoline and diesel sellers, with the economic burden of the tax being shifted to plaintiff only by the independent actions of those sellers. On this count, the court observed that "[t]he excise tax was levied against plaintiff's suppliers, absent any contemplation in the taxing statute itself that said tax should be passed on to the plaintiff. On the contrary, plaintiff contracted with its suppliers to pay to them costs approximating the economic equivalence of taxes ... " *Ammex,* 52 Fed.Cl. at 559; *see also Dow Jones & Co. v. United States,* 128 F.Supp. at 750.

Plaintiff, however, argues that it was economically inevitable that the coal producers would pass along the tax to it, either as a separate line item or, at least, in determining the selling price of the coal. While this contention is superficially appealing, it is belied, in the first instance, by plaintiff's own assertion that *it* did not pass the tax along to its consumers—an observations that gives a whole new meaning to the old adage, "Do as I say, not as I do." Plaintiff's position also is irreconcilable with the substantial body of case law construing 26 U.S.C. § 6416. In relevant part, that provision prohibits a refund of excise taxes unless the individual who paid the tax establishes that it "has not included the tax in the price of the article with respect to which it was imposed and has not

collected the amount of the tax from the person who purchased such article."[13] 26 U.S.C. § 6416(a)(1)(A).[14] Applying this statute, this court and the Court of Claims have on numerous occasions been required to determine whether a particular excise tax was absorbed by the manufacturer or passed on to its customers. Notably, for our purposes, these cases do not assume that the excise taxes will be passed along, but instead employ a multi-factored analysis that takes into account, for example, the correlation between price changes and the application of the tax, whether the tax is separately invoiced, the existence of negotiated contracts including the excise taxes and the taxpayer's profitability. *See Worthington Pump & Machinery Corp. v. United States,* 129 Ct.Cl. 87, 122 F.Supp. 843, 847 (1954); *Tenneco, Inc. v. United States,* 17 Cl.Ct. 345, 347 (1989), *aff'd,* 899 F.2d 1227 (Fed.Cir.1990). These and other cases, moreover, make clear that the nature of this inquiry may differ markedly depending on whether and to what extent the price for a given item is cost-based or market-driven. *See, e.g., Tenneco,* 17 Cl.Ct. at 347; *Holmes Limestone Co. v. United States,* 946 F.Supp. 1310, 1314 (N.D.Ohio 1996).

For our purposes, the significance of these cases lies not in how they determine that a tax has been shifted, but simply in exhibiting that such a shifting is not preordained. That all or significant portion of a given excise tax may be absorbed by the seller/producer thus destroys any notion that the passing along of such a liability is the "determinative or coercive effect" of the imposition of such a tax. Rather, the determination whether such a tax will be passed on involves the independent judgment of a third party—the seller/producer—made by reference to a whole range of facts.[15] For standing purposes, the

---

13. If the individual who paid the tax passed it along, it still may be able to sue for a refund if, for example, it can show that it repaid the amount of the tax to the ultimate purchaser of the article. 26 U.S.C. § 6416(a)(1)(B).

14. This section was enacted to prevent a manufacturer or dealer from being unjustly enriched by recovering an overpayment of tax that was passed on to a purchaser. *See Travel Industries of Kansas, Inc. v. United States,* 425 F.2d 1297,

1298–99 (10th Cir.1970) (summarizing the legislative history of this provision).

15. For further indication of the complexity of setting prices and the factors that enter into whether a given seller will pass along a particular cost to a purchaser, *see, e.g., Illinois Brick Co. v. Illinois,* 431 U.S. 720, 726, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (discussing this concept in the context of a Sherman Act antitrust action); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396, 1402 (7th Cir.1989) (same). In

mere existence of such discretion, no matter how it is exercised in a particular situation, breaks the requisite chain of causation between the imposition of the tax and any economic harm in the form of higher costs suffered by the purchaser thereof. *See Mideast Sys. and China Civil Constr. Saipan Joint Venture, Inc. v. Hodel,* 792 F.2d 1172, 1178 (D.C.Cir.1986) ("the presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied"). Accordingly, standing in this case neither rises nor falls on whether the seller of the coal included a specific provision passing along the tax to a given purchaser. What is the sockdolager here—and fatal to plaintiff's pursuit of standing—is that the sellers of its coal had a choice whether to pass along or absorb the tax.

Were this a case involving private parties, perhaps a contract provision passing along a tax would be covered by the "doctrine that the assignee of [a] claim has standing to assert the injury in fact suffered by the assignor." *Vermont Agency of Natural Resources v. United States,* 529 U.S. 765, 773, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). But in a case involving the government, such an approach is foreclosed by the Anti–Assignment Act, 31 U.S.C. 3727, which, in terms the Supreme Court has described as "broad" and "all-inclusive," *United States v. Shannon,* 342 U.S. 288, 292–93, 72 S.Ct. 281, 96 L.Ed. 321 (1952), prohibits the "transfer or assignment of any part of a claim against the United States Government or of an interest in the claim." This Act precludes even unintentional assignments—even one, for example, that might be occasioned by shifting to a purchaser the financial burden of a tax imposed by the United States. *See generally, National Bank of Commerce v. Downie,* 218 U.S. 345, 350, 31 S.Ct. 89, 54 L.Ed. 1065 (1910); *Spofford v. Kirk,* 97 U.S. 484, 488–89, 24 L.Ed. 1032 (1878). Applying the Act to the latter situation, in fact, fulfills at least two fundamental purposes underlying the statute: first, to "prevent possible multiple payment of claims ... and to enable the Government to deal only with the original claimant," *United States v. Aetna Casualty & Surety Co.,* 338 U.S. 366, 373, 70 S.Ct. 207, 94 L.Ed. 171 (1949);[16] and second, to preserve the defendant's defenses against the transferor that may be inapplicable to the transferee, *Shannon,* 342 U.S. at 291–92, 72 S.Ct. 281; *Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 142–43 (2002); *MDS Associates, Ltd. v. United States,* 31 Fed.Cl. 389, 393 (1994), *aff'd,* 135 F.3d 778 (Fed.Cir. 1998).[17] By comparison, adopting plaintiff's

---

another antitrust case, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Supreme Court discussed this issue thusly—

A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. *Id.* at 492–93, 88 S.Ct. 2224.

16. *See also Shannon,* 342 U.S. at 293, 72 S.Ct. 281 ("One of Congress' basic purposes in passing the Act was 'that the government might not be harassed by multiplying the number of persons with whom it had to deal.' ").

17. Indeed, the Anti–Assignment Act is one of the underlying rationales for the so-called *Severin* doctrine. Under that doctrine, subcontractors under government contracts ordinarily do not have standing to sue the government. *See Severin v. United States,* 99 Ct.Cl. 435, 442, 1943 WL 4198 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944). In so concluding, the Court of Claims reasoned that the subcontractor may not sue in its own right even though the contract between it and the prime contractor allocates a particular cost to the subcontractor because such a contract, under the Anti–Assignment Act, cannot have the effect of shifting the claim regarding the cost to the subcontractor.

theory would potentially require this court to consider the overlapping claims not only of the seller/manufacturer and its immediate purchaser, but also those of any subsequent purchasers *ad infinitum,* any one of which might plausibly argue that it bore at least a portion of the damages caused by the unconstitutional imposition of the coal tax. *See generally, Savannah Sugar Refining Corp. v. Commissioner,* 121 F.2d 426, 427 (5th Cir. 1941) (discussing the problems with proceeding in this fashion); *Alexander Smith & Sons Carpet Co. v. Commissioner,* 117 F.2d 974 (2d Cir.1941) (same).

The short of it is that the causal relationship between the imposition of the Coal Tax and plaintiff's alleged economic injury here is too remote. As such, plaintiff has failed to establish its standing to seek the damages it claims under the Export Clause.

## B. Takings Claim

■ Plaintiff next contends that in imposing the Coal Tax on its transactions, the United States effected a taking of its property in violation of the Fifth Amendment. This claim, however, plainly is foreclosed by *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1339 (Fed.Cir.2001) (en banc), *cert. denied,* —— U.S. ——, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002). There, the Federal Circuit, construing the Supreme Court's opinions in *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), held that the imposition of an excise tax results neither in a *per se* or regulatory taking, as there can be no taking of money under the Fifth Amendment. The court rea-

soned that the imposition of the tax did not involve an interest in physical or intellectual property, but rather an ordinary liability to pay money, concluding that the "imposition of an obligation to pay money does not constitute an unconstitutional taking of property." *Commonwealth Edison,* 271 F.3d at 1339–40; *see also United States v. Sperry Corp.,* 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989); *U.S. Shoe Corp. v. United States,* 296 F.3d 1378, 1383 (Fed.Cir.2002) (imposition of Harbor Maintenance Tax not a taking); *Atlas Corp. v. United States,* 895 F.2d 745, 756 (Fed.Cir.1990), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990) ("Requiring money to be spent is not a taking of property."). In this court's view, the holding and rationale of this *en banc* opinion fit this case like a glove and yield a similar result.

Even were that not true, the takings claim alleged here would squash headlong into *Casa De Cambio Comdiv S.A., De C.V. v. United States,* 291 F.3d 1356 (Fed.Cir.2002), *aff'g,* 48 Fed.Cl. 137 (2000). There, the Federal Circuit reiterated the long-standing rule that a "compensable taking does not occur unless the government's actions on the intermediate third party have a 'direct and substantial' impact on the plaintiff asserting the takings claim." *Id.* at 1361 (quoting *Nat'l Bd. of YMCA v. United States,* 395 U.S. 85, 93, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969)).[18] It held that the depositor of stolen Treasury check (Casa) could not maintain a taking claim when the Federal Reserve Bank, upon discovering that the Treasury check it had paid had been stolen, recouped the proceeds of the check from the presenting bank (Nor-

*See Severin,* 99 Ct.Cl. at 442; *see also George Hyman Constr. Co. v. United States,* 30 Fed.Cl. 170, 173 (1993), *aff'd,* 39 F.3d 1197 (Fed.Cir. 1994). Here too, the contract between the seller and the purchaser cannot have the effect of shifting the seller's claim to the purchaser. It should be noted that under the *Severin* doctrine, if the prime contractor is liable to the subcontractor for damages sustained by the subcontractor, that prime contractor may bring an action against the government to recoup what essentially are the subcontractor's damages. *See Severin,* 99 Ct.Cl. at 443; *see also W.G. Yates & Sons Constr. Co., Inc. v. Caldera,* 192 F.3d 987, 991 (Fed.Cir.1999); *E.R. Mitchell Constr. Co. v. Danzig,* 175 F.3d 1369, 1370 (Fed.Cir.1999). By analogy to the contract scenario, one might surmise that the

seller/manufacturer which pays the excise tax might be able to sue for damages under the Tucker Act, even though it has passed the tax along, provided it can show that it is somehow obliged to reimburse its purchaser if it recovers. *See 123 East Fifty–Fourth St., Inc. v. United States,* 157 F.2d 68, 70 (2d Cir.1946). Whether this theory actually bears out, however, is an issue for another day.

18. *See also Shewfelt v. United States,* 104 F.3d 1333, 1337 (Fed.Cir.1997); *Erosion Victims of Lake Superior Regulation v. United States,* 833 F.2d 297, 301 (Fed.Cir.1987); *Langenegger v. United States,* 756 F.2d 1565, 1572 (Fed.Cir. 1985), *cert. denied,* 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985).

west), which, in turn, debited the depositor's account. Surveying numerous cases, the Federal Circuit found that "[b]ecause the government did not direct Norwest to take action against Casa, and because Norwest did not act as the alter ego or agent of the government, Casa has not stated a claim for relief under the Takings Clause." *Id.* at 1363. In this court's view, a similar holding is compelled here—the government neither directed the seller/manufacturers to collect the Coal Tax from Emerald nor did the seller/manufacturer act as the government's agent in allegedly passing along the tax. As such, plaintiff's takings claim is not well-founded.

### C. Illegal Exaction [19]

▮ Plaintiff next asserts that the United States has illegally exacted money from it in violation of the Export Clause. Under the Tucker Act, illegal exaction jurisdiction lies where a plaintiff "has paid money over to the Government, directly or in effect," and "seeks return of all or part of that sum arguing" that it "was improperly paid, exacted, or taken from [it] in contravention of the Constitution, a statute, or a regulation." *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1007–1008 (1967).[20] Such is not the case here.

As described in greater detail above, the portion of the coal price allegedly paid by plaintiff in respect of the Coal Tax was neither paid directly to defendant, nor paid to a third party at the direction of the defendant, nor even extracted by the coal producers from plaintiff at the direction of the defendant. In such circumstances, the Federal Circuit has held that an illegal exaction claim does not lie. Thus, in *Casa De Cambio, supra,* the court refused to impute to the government the actions of the presenting bank in collecting funds from its depositor in response to the Federal Reserve's action against the presenting bank. The court rejected the notion that the illegal exaction doctrine could be stretched to encompass a situation in which the presenting bank neither acted at the government's behest nor pursuant to a statute or a regulation, but rather in its own self-interest. In this regard, it reasoned that the same standard applicable to takings actions was applicable to illegal exaction claims, stating that the relevant precedents "only echo the standard in the Takings Clause context that a plaintiff has a claim for an illegal exaction only where the government has direct and substantial impact on the plaintiff asserting the claim." 291 F.3d at 1364. Applying this standard, the court concluded "this test is identical to the Takings test, and again that no such direct action by the United States is alleged here." *Id.* The court thus rejected any notion that an illegal exaction claim could be based simply upon the foreseeable reaction of some third party in imposing on its customer a charge that had been exacted by the United States.[21]

---

**19.** Various arguments in defendant's briefs are directed at explaining why plaintiff cannot maintain a tax refund suit before this court. In its briefs and at oral argument, plaintiff made clear that it is not pursuing such a suit. At one point, however, plaintiff suggests that because it might have been able to file a refund suit, this court has jurisdiction to consider its other claims. But, plaintiff's ability to file a refund suit appears to be based upon a specific statute, 26 U.S.C. § 6416(c), which authorizes an "exporter" or "shipper" to file a refund claim if it meets certain conditions, among them that the "person who paid such taxes waives his claim to such amount." Even if this provision were applicable here, its existence does not suggest that plaintiff may maintain other forms of action. Indeed, this provision reaffirms Congress' understanding that it is the seller/producer, rather than the purchaser, who is subject to the excise tax.

**20.** *See also New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1556 (Fed.Cir.1997), *cert. denied,* 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1572–73 (Fed.Cir. 1996). *See also* 14 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3657 at p. 487 (3d ed.1998).

**21.** In discussing this same point, this court's opinion in *Casa De Cambio* stated—

Essentially, plaintiff's claim is that the Treasury set into motion a sequence of events that ultimately resulted in its loss. But, neither Treasury nor the Federal Reserve ordered Norwest to debit plaintiff's account, as might be the case in a tax levy. Rather, Norwest made an independent decision to exercise what it believed were its rights under its deposit contract with Casa. To hold this enough to impose

Accordingly, plaintiff's illegal exaction claim suffers the same fate as its takings claim—and for the same reasons. Here, as in *Casa De Cambio*, plaintiff's "loss" was not occasioned by the direct and substantial action of the United States, but rather "derived from the enforcement of alleged rights under a contract [*i.e.*, the coal purchase agreements] to which the government was not a party." 48 Fed.Cl. at 144–45. As such, there was no illegal exaction here.[22]

### D. Suit Based on Implied Contract In Law

■■■ Finally, plaintiff seeks to recover under an implied contract. In this regard, it is axiomatic that Tucker Act jurisdiction "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules, Inc. v. United States*, 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *see also Sanders v. United States*, 252 F.3d 1329, 1334 (Fed.Cir.2001). In the instant case, Emerald entered into no express contract with the United States. Likewise, it appears that no contract implied in fact arose here. "A contract implied in fact exists only where the circumstances illustrate that the equivalent of mutual assent is present." *Collins v. United States*, 209 Ct.Cl. 413, 532 F.2d 1344, 1351 (1976); *see also Hercules*, 516 U.S. at 423–24, 116 S.Ct.

981; *Porter v. United States*, 204 Ct.Cl. 355, 496 F.2d 583, 590–91 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). Conversely, a contract implied in law is one in which a duty to make restitution is implied, regardless of the lack of mutual assent, for reasons of justice and equity. *See Hercules*, 516 U.S. at 424, 116 S.Ct. 981; *see also Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923). There is absolutely no indication of mutual assent in this case. Rather, plaintiff's case is based solely on the notion that it is inequitable for it to have borne the impact of the Coal Tax and yet be unable to recover the same from the United States. Since it can neither be shown that an express contract or one implied in fact existed and since this court's jurisdiction over implied contracts is limited to contracts implied-in-fact, plaintiff's claim on this count must fail.[23]

### III. Conclusion

This court need go no further. Each of the counts in plaintiff's complaint wilts in the hot glare of precedent and all for essentially the same reason—a lack of causation. That this same legal finding should have conclusive impact in two arenas—that of constitutional standing and the Tucker Act—should come as no surprise, for both laws and their

illegal exaction liability on the government would be to open a whole range of new justiciable claims essentially focusing on whether the government proximately caused some third party's injury, thereby adopting a new form of liability primarily based on foreseeability. One can conceive of a garden variety of situations where, for example, the government imposes a cost on an entity, that entity shifts the cost to a third party and the third party might argue the government's action in dealing with the intermediary was unconstitutional or violative of a statute or regulation. While the "injury" to a third party in these circumstances may well be reasonably foreseeable or even occur with the government's full knowledge, that, in this court's view, is no more adequate to impose illegal exaction liability than it is, under the decided case law, to impose liability under the Takings Clause.
*Casa de Cambio*, 48 Fed.Cl. at 145.

**22.** In arguing to the contrary, plaintiff relies on this court's decision in *Fireman v. United States*, 44 Fed. Cl. 528 (1999). However, that opinion

seems inconsistent with the approach taken by the Federal Circuit in *Casa De Cambio*, and arguably was overruled by the latter decision. *See Casa De Cambio*, 291 F.3d at 1364 n. 1 (noting the *Fireman* decision). At all events, *Fireman* is distinguishable for the reasons stated in this court's opinion in *Casa de Cambio*, 48 Fed.Cl. at 147–48.

**23.** Plaintiff suggests that this court may hear equitable claims when they are incidental to this court's exercise of jurisdiction under the Tucker Act. There are at least two problems with this suggestion. First, plaintiff cites no statutory support for this claim and, indeed, there is none, as the limited forms of equitable relief afforded to this court are unavailable here. *See, e.g.,* 28 U.S.C. §§ 1491(a)(2), 1491(b)(1). Second, the only case cited by plaintiff in support of this jurisdiction, *Carney v. United States*, 199 Ct.Cl. 160, 462 F.2d 1142, 1145 (1972), specifically forecloses the granting of any "specific equitable relief," which is precisely what plaintiff seeks here. *See Guardsman Elevator Co. v. United States*, 50 Fed.Cl. 577, 584 (2001).

associated jurisprudence, in their own way, focus on whether there was an adequate nexus between an action taken by the United States and the harm alleged by a given plaintiff. Here, there was not. Rather, plaintiff has suffered, at best, what the common law termed a *damnum absque injuria*—a harm without legal injury—and must look elsewhere for a remedy. As such, and for the foregoing reasons, this court **GRANTS** defendant's motion for summary judgment.